Aaron J. Solomon, Esq.
OVED & OVED LLP
*Attorneys for Plaintiffs*
401 Greenwich Street
New York, NY 10013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

| | |
|---|---|
| TIGRAN OHANIAN, INDIVIDUALLY AND ON BEHALF OF ALL OTHER PERSONS SIMILARLY SITUATED, AND REGGE LOPEZ, INDIVIDUALLY AND ON BEHALF OF ALL OTHER PERSONS SIMILARLY SITUATED, | CASE NO.: 20-cv-05162 |
| | **CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| *Plaintiffs*, | |
| - against - | |
| APPLE INC. AND T-MOBILE USA, INC. | |

-------------------------------------------------------------------X

Plaintiffs Tigran Ohanian ("Ohanian") and Regge Lopez ("Lopez") (collectively, "Named Plaintiffs"), by their attorneys, Oved & Oved LLP, complaining of Defendants Apple Inc. ("Apple") and T-Mobile USA, Inc. ("T-Mobile") allege upon knowledge as to themselves, and upon information and belief as to all other matters, as follows:

## SUMMARY OF CLAIMS

1.      This is a class action brought to redress Apple's deceptive acts and practices and material omissions regarding the data privacy and security of its mobile devices, namely the iPhone and the iMessage and FaceTime features that are unique to the iPhone, as well as T-Mobile's deceptive acts and practices and material omissions related to its subscriber identification modules ("SIM cards"), by which it provides telecommunications services to consumers through the iPhone.

2.      During the time period in question, Apple represented to consumers, through a variety of marketing campaigns both in print and through digital mediums, that the iPhone was

designed to protect the privacy of users' data and confidential personal information, and that the iMessage and Facetime features unique to the iPhone were highly secure methods of communication.  As such, Apple was able to command premium prices for the sale of the iPhone as compared to other smartphones that were available for purchase on the market.

3.      At the same time, however, Apple deceived consumers by failing to disclose a significant security flaw in the Apple iOS software – the operating system for the iPhone – known only to Apple that allowed iMessage correspondence sent by iPhone users and FaceTime calls made by iPhone users to be improperly directed to and accessed by third parties.

4.      During that same time period, T-Mobile marketed and sold iPhone-compatible SIM cards to consumers for use in the iPhone.  However, T-Mobile deceived consumers – who were under the reasonable belief that the SIM cards would provide them with a private and secure means to communicate through the iPhone on T-Mobile's wireless network – by failing to disclose that its practice of recycling phone numbers linked to SIM cards, and selling those SIM cards to consumers without requiring prior users to manually disassociate their Apple IDs from the phone numbers associated with the recycled SIM cards, did not protect the privacy of users' data and confidential personal information.

5.      Apple's failure to disclose the security flaw in the Apple iOS software used in the iPhone, as well T-Mobile's failure to disclose the fact that its SIM card practices did not protect the privacy of users' data and confidential personal information, caused consumers who purchased iPhones and/or utilized T-Mobile SIM cards in iPhones to become the unsuspecting victims of extensive data security breaches when their iMessage correspondence and FaceTime calls were improperly accessed by third parties without their knowledge or authorization.

6.      Apple's release of the iOS 12 software on or about September 17, 2018 purportedly resolved these data security issues for iPhone users that actually installed the software, yet Apple never informed iPhone users, consumers, or the general public of the fact that the known security flaw in the iOS software led to innumerable unintended disclosures of iPhone users' iMessage correspondence and FaceTime calls to third parties for nearly seven years prior to that. Indeed, even to this day, not all consumers that purchased iPhones or T-Mobile SIM cards for use in iPhones have installed the iOS 12 software on their iPhones, and the data security breaches alleged herein still may be affecting those consumers.

7.      Named Plaintiffs, both of whom are iPhone users that purchased T-Mobile SIM cards in order to utilize the communications features of the iPhone including iMessage and FaceTime, bring this proposed consumer class action on their own behalf and on behalf of all other persons similarly situated who, from the applicable limitations period through the present (the "Class Period") purchased Apple iPhones and/or T-Mobile SIM cards for use in iPhones, and utilized the iMessage and FaceTime features included in all iPhones.

## THE PARTIES

8.      Ohanian is a natural person presently residing in Moscow, Russia.

9.      Lopez is a natural person presently residing in the State of Florida.

10.     Apple is a multinational company that manufactures, advertises, markets, distributes, and sells, *inter alia*, computer hardware, software, and mobile devices, including the iPhone.  Apple is a California corporation with its principal place of business located at One Apple Park Way, Cupertino, California 95014.

11.     T-Mobile is a wireless mobile network operator that manufactures, advertises, markets, distributes, and sells, *inter alia*, SIM cards.  T-Mobile is a Delaware Corporation with

its principal place of business located at 12920 SE 38th St., Bellevue, Washington 98006.

## JURISDICTION / VENUE

12.     This Court has original jurisdiction over this matter pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a class action, as defined by 28 U.S.C. § 1332(d)(1)(B), in which there are 100 or more class members, a member of the putative class is a citizen of a different state than Apple and T-Mobile, and the amount in controversy exceeds the sum or value of $5,000,000.00, excluding interest and costs.

13.     This Court has personal jurisdiction over Apple pursuant to CPLR § 302(a)(1) because it transacts business in the State of New York by advertising, marketing, distributing, and selling its consumer product, the iPhone, throughout New York State to consumers in New York State, including Named Plaintiffs and members of the class, and it engaged in the wrongdoing alleged herein in New York State.  Further, Apple has sufficient minimum contacts with New York State and has intentionally availed itself of the consumer market in New York State, rendering the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

14.     This Court has personal jurisdiction over T-Mobile under CPLR § 302(a)(1) because it transacts business in the State of New York by advertising, marketing, distributing, and selling SIM cards throughout New York State to consumers in New York State, including Named Plaintiffs and members of the class, and it engaged in the wrongdoing alleged herein in New York State.  Further, T-Mobile has sufficient minimum contacts with New York State and has intentionally availed itself of the consumer market in New York State, rendering the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in this District.

## CLASS ALLEGATIONS

16.     This action meets the prerequisites of a Class Action under Rule 23(a) of the Federal Rules of Civil Procedure.

17.     This action is brought on behalf of Named Plaintiffs and a class consisting of similarly situated individual consumers who (i) purchased one or more iPhones, or purchased one or more T-Mobile SIM cards for use in iPhones, during the Class Period; and (ii) utilized the iMessage and/or FaceTime features of the iPhones through the SIM cards during the Class Period, by which they became victims of the pervasive data security breaches as alleged herein.

18.     This action meets the numerosity requirement because the putative class is so numerous that joinder of all members is impracticable.  The exact size of the putative class in New York State is not yet known, but it is believed to be in excess of 1 million consumers.

19.     This action meets the commonality requirement because common questions of law and fact arise from the wrongful conduct of Apple and T-Mobile directed at Named Plaintiffs and members of the class as described herein that violated New York General Business Law § 349 ("NY GBL § 349") and New York General Business Law § 350 ("NY GBL § 350"), and also give rise to common law claims for fraudulent misrepresentation and unjust enrichment. Such questions include, *inter alia*:

   a.     Whether Named Plaintiffs and members of the class purchased iPhones or T-Mobile SIM cards for use in iPhones during the Class Period, and utilized the iMessage and FaceTime features unique to iPhones during the Class Period;

   b.     Whether Apple possessed material information regarding a security flaw in the iOS software utilized in the iPhone that allowed iMessage correspondence and FaceTime calls to be improperly accessed by third parties without the knowledge or authorization of iPhone users;

    c.      Whether Apple failed to disclose the existence of the above-mentioned security flaw to consumers;

    d.     Whether T-Mobile possessed material information that its practice of recycling phone numbers linked to SIM cards, and selling those SIM cards to consumers without requiring prior users to manually disassociate their Apple IDs from the phone numbers associated with the recycled SIM cards, did not protect the privacy of users' data and confidential personal information;

    e.     Whether T-Mobile failed to disclose to consumers that its SIM card practices did not protect the privacy of users' data and confidential personal information;

    f.     Whether Named Plaintiffs and members of the class suffered damages as a result of Apple and T-Mobile's violations of NY GBL §§ 349 and 350;

    g.    Whether Named Plaintiffs and members of the class suffered damages as a result of Apple's fraudulent misrepresentations and material omissions regarding the data privacy and security features of the iPhone as alleged herein;

    h.    Whether Named Plaintiffs and members of the class suffered damages as a result of T-Mobile's fraudulent and material omissions regarding its SIM card practices as alleged herein; and

    i.     Whether Apple and T-Mobile were unjustly enriched by their conduct as alleged herein.

20.    This action meets the typicality requirement because Named Plaintiffs are members of the putative class and Named Plaintiffs' claims are typical of the claims of the putative class.  Specifically, Named Plaintiffs and each and every member of the putative class were victims of the same deceptive acts and practices and material omissions made by Apple regarding the data privacy and security of its mobile devices, and the deceptive acts and practices and material omissions of T-Mobile related to its SIM cards.  Further, Named Plaintiffs seek and are entitled to relief under the same causes of action as other members of the putative class.

21.    This action also meets the adequacy requirement.  Named Plaintiffs and their counsel will fairly and adequately protect the interests of the putative class, given that Named Plaintiffs have retained counsel experienced in class action litigation.  Additionally, Named

Plaintiffs and the class members will not have antagonistic interests to one another, because they seek the same relief for the wrongful conduct of Apple and T-Mobile as alleged herein.

22.     Further, this action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b), because a class action would prevent unduly duplicative litigation as well as inconsistent or varying adjudications pertaining to the unlawful actions of both Apple and T-Mobile as alleged herein.

23.     Moreover, this action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b), because the questions of law or fact common to Named Plaintiffs and the putative class members discussed *supra* predominate over any questions affecting only individual class members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Named Plaintiffs and the putative class members also lack the financial resources to adequately prosecute separate lawsuits against Apple and T-Mobile.

## FACTUAL ALLEGATIONS

### A.     Apple's iPhone and Marketing Campaigns

24.     Apple is an American multinational company that designs, develops, and sells technology products such as the iPhone.  Apple's iPhone utilizes operating software known as iOS.

25.     For years, Apple aggressively marketed the security and privacy features of its products, including the iPhone, in order to encourage consumers to purchase those products.

26.     For example, since 2009, Apple's privacy policy has included the phrase, "Your privacy is a priority at Apple, and we go to great lengths to protect it."  In fact, a 2009 consumer

survey conducted by the Ponemon Institute ranked Apple eighth in the World/USA among all companies as "most trusted for privacy."

27.     In addition, beginning in July 2010, Apple consistently marketed the iPhone to consumers through its website and through other public advertisements as being "[s]afe and secure by design."  At that time, Apple also made representations to consumers that "iOS 4 [the iPhone operating system] is highly secure from the moment you turn on your iPhone. All Apps run in a safe environment, so a website or app can't access data from other Apps. iOS 4 supports encrypted network communication to protect your sensitive information. . . ."

**B.     Apple Introduces the FaceTime and iMessage Features on the iPhone**

28.     In or about June 2010, Apple introduced FaceTime, allowing iPhone users to communicate with contacts who also had iPhones through a specialized and proprietary videotelephone feature.

29.     Approximately one year later, in or about October 2011, Apple released its own encrypted instant messaging service, called iMessage, which allowed iPhone users to communicate with contacts who also had iPhones through a proprietary messaging feature.

30.     Both services were automatically included in and operated on the iPhone through the iOS system, were features unique to the Apple iPhones, and were not available on other smartphones.

**C.     SIM Cards and T-Mobile**

31.     Following a consumer's purchase of an iPhone, the iMessage and FaceTime features would become associated with the iPhone user's phone number, Apple ID, and email address.

32.     In order to utilize the iMessage or FaceTime features of the iPhone on a wireless network, a SIM card needs to be used, which is a small, removable card used to, *inter alia*, store data such as the user's phone number and mobile carrier information.

33.     Wireless network operators, including T-Mobile, sold SIM cards to consumers, and marketed and distributed the SIM cards specifically for use in the iPhone.

34.     Once the iPhone is equipped with a SIM card, both the iMessage and FaceTime features register with the iPhone user's phone number from the SIM card, after which the iPhone user can begin sending iMessage correspondence and making FaceTime calls.  Specifically, in order to send iMessage correspondence or make a FaceTime call, the iPhone reads the iPhone user's phone number from the SIM card.

**D.     Apple's Continued Marketing Efforts and Representations to Consumers**

35.     After releasing the iMessage and FaceTime features on the iPhone, Apple continued to market the security and privacy features of the iPhone, including the iMessage and FaceTime features, through various advertisements both in print and in digital media.  Namely, between approximately 2011 and 2014, Apple continuously and repeatedly represented to consumers that, *inter alia*:

- iMessages on the iPhone were "unlimited" and "secure, too";

- the iOS operating system on the iPhone was "highly secure from the moment you turn on your iPhone";

- the iOS operating system on the iPhone protected users' "sensitive information";

- iOS-equipped devices such as the iPhone provided "stringent security technology and features"; and

- communications on the iPhone using iMessage and FaceTime were "fully encrypted."

36.     Apple continued to update the technology of the iPhone and the iOS operating system through 2015.  At that time, when it introduced the operating system known as iOS 9 – which continued, without interruption, to include iMessage and FaceTime – for use on the iPhone, Apple represented to consumers that "the foundation of iOS" had become "even stronger" and that Apple had brought to market "advanced security features to further protect" the privacy of iPhone users.

37.     Apple again continuously and repeatedly marketed the security and privacy features of the iPhone, including the iMessage and FaceTime features through 2016 and 2017, claiming, *inter alia*:

- "security and privacy are fundamental to the design of Apple hardware, software and services";

- iMessage and FaceTime used end-to-end encryption to protect iPhone users' data;

- "Customers expect Apple and other technology companies to do everything in our power to protect their personal information, and at Apple we are deeply committed to safeguarding their data";

- iOS keeps iPhone users' information private;

- "At Apple, protecting your information is something we build into our processes from the beginning";

- "iOS is designed to put your privacy first";

- "iOS offers the most advanced security of any mobile operating system";

- "The point is, security runs throughout the entire system – everything from the hardware to iOS to the App Store"; and

- "Apple products are designed to do amazing things.  And designed to protect your privacy."

38.     In or about September 2017, Apple launched an updated website with a new look and information to highlight its position regarding consumers' data privacy rights through the

use of Apple products, including iPhones.  Namely, at that time, Apple made the following representations to consumers:

> At Apple, we believe privacy is a fundamental human right.  And so much of your personal information – information you have a right to keep private – lives on your Apple devices…Who you call, email, or message.  Every Apple product is designed from the ground up to protect that information.  And to empower you to choose what you share and with whom.  We've proved time and time again that great experiences don't have to come at the expense of your privacy and security.

**E.**    **Apple's iOS Operating System Allows Users' Communications
Through FaceTime and iMessage Services to Be Accessed by Third Parties**

39.    From the time that Apple first introduced Facetime (June 2010) and iMessage (October 2011) on the iPhone, a significant security flaw existed in the iOS software, allowing iMessage correspondence and FaceTime calls to be improperly accessed by third parties.

40.    Specifically, when an iPhone user ceased using a SIM card and the phone number associated with that SIM card was subsequently recycled by a wireless network carrier such as T-Mobile, the previous owner of the SIM card associated with that phone number would still be able to receive iMessages and FaceTime calls on his or her iPhone that were intended to be received by the new owner of that phone number.  This was due to the fact that the Apple ID associated with iMessage and FaceTime had a legacy connection to the phone number of the recycled SIM card.

41.    In other words, because of the legacy connection, iMessage correspondence and FaceTime calls directed to the new owner of a phone number would lead to the iMessage correspondence or FaceTime call being unknowingly and improperly misdirected to the prior owner of the phone number because of its previous association with the SIM card.

1da76a4f4195d317

42.     As such, during the Class Period, all iPhones were capable of receiving, and routinely did receive, incoming iMessage correspondence and FaceTime calls that were intended for another iPhone user.

43.     Similarly, during the Class Period, all outgoing iMessage correspondence and Face Time calls were capable of being unknowingly misdirected to an unintended iPhone user.

44.     In fact, the only method by which the unintended and improper disclosure of iPhone users' iMessage correspondence and FaceTime calls could be prevented during the time period in question was the forced disassociation of an Apple ID by the previous owners of the phone numbers associated with the recycled SIM cards, which neither Apple nor T-Mobile ever voluntarily disclosed to consumers.

45.     Rather, during the time period in question, Apple knowingly allowed multiple unrelated Apple IDs of consumers that had purchased iPhones to coexist and to be associated with the same phone number, while T-Mobile compounded the problem by engaging in the deceptive SIM card practices, as alleged *supra*.

46.     Indeed, during this time, if an iPhone user was to take another iPhone user's SIM card out of his or her iPhone, put it inside their iPhone, and subsequently return the SIM card to the first user's iPhone, both iPhone users would receive iMessage correspondence and FaceTime calls directed to the phone number of the first user of the SIM card, because of the automatic association with the Apple ID.

**F.     The First Known Victims**

47.     The first known victims of the data security breach described herein occurred in 2011 when users' iPhones were stolen or resold.

48.     The issue arose again in February 2012 when Sam Biddle, an employee of an Apple Store, had his personal messages duplicated on the iPhone of an unknown person.

49.     Apple did not conduct an internal investigation of the results of events that occurred with Sam Biddle in 2012.  If there were conclusions about what happened, they would be subject to publication, since the security breaches affected an indefinite number of users.

50.     In 2011, Ars Technica reported that, although iPhone owners would rightfully assume that their messages were secure, in reality, "thieves and unsuspecting buyers [were] still able to send and receive iMessages as the original owner – even after the device is registered under a new account.  Almost nothing seems to work – remote wiping, changing Apple ID passwords, or even moving the old phone number to a new phone—and users are becoming more than frustrated that thieves are so easily able to pose as them."  The article made reference to several iPhone users that had their communications misdirected despite several attempts to cure the problem themselves.

51.     iOS security expert Jonathan Zdziarski stated the following regarding this issue: "iMessage registers with the subscriber's phone number from the SIM, so let's say you restore the phone, it will still read the phone number from the SIM.  I suppose if you change the SIM out after the phone has been configured, the old number might be cached somewhere either on the phone or on Apple's servers with the UDID of the phone."

52.     As such, it is clear that Apple allows its services to pull old phone numbers, even after a SIM card is removed or deactivated.

**G.     Named Plaintiffs' Claims**

53.     Named Plaintiffs were exposed to Apple's extensive public marketing and advertising campaigns, wherein Apple represented that its iPhones were secure and protected

users' data privacy and confidential information from unintended disclosure to third parties, and Named Plaintiffs purchased an iPhone 6s (Ohanian) and an iPhone 6 plus (Lopez) on that basis.

54.     During the Class Period, Ohanian paid a premium price to purchase the iPhone 6s.

55.     During the Class Period, Ohanian was on vacation in New York City, where he paid a premium price to purchase a new SIM card from a T-Mobile store in Manhattan, New York.

56.     The SIM card that Ohanian purchased from T-Mobile (the "Ohanian SIM Card") provided him with a phone number for use in his iPhone, and further, gave Ohanian access to T-Mobile's wireless network in order to utilize the iMessage and FaceTime features of the iPhone.

57.     Ohanian inserted the Ohanian SIM Card into his iPhone, activated it, and it automatically linked to his Apple ID.

58.     Ohanian used that particular phone number during the Class Period for approximately one year.

59.     During the Class Period, Lopez paid a premium price to purchase an iPhone 6 plus at the Apple Store in Queens, New York.

60.     During the Class Period, Lopez switched wireless carriers accounts and obtained a new T-Mobile account.

61.     In connection therewith, Lopez purchased, and T-Mobile installed, a new SIM card in Lopez's iPhone, which provided him with a new phone number (the "Affected Number").

62.     Lopez's iPhone then automatically associated his Apple Account and thus, his iMessage and FaceTime, with the Affected Number.

63.     Unbeknownst to Lopez, the Affected Number was the same number that T-Mobile had previously provided to Ohanian with the Ohanian SIM Card.

64.     Even though the Ohanian SIM Card was deactivated and not even still inserted into Ohanian's iPhone, Ohanian began receiving extensive amounts of unwanted communications on his iPhone 6s via iMessage and FaceTime, which appeared to be addressed to an unknown new owner of the Affected Number.

65.     These communications, which were from total strangers, included various media content.  Specifically, during the Class Period, Ohanian received more than 100 iMessages and FaceTime calls which included, *inter alia*, private photographs (including those of young children) and communications that clearly were directed not to Ohanian, but instead were directed to the unknown new owner of the Affected Number that Ohanian previously had utilized in connection with the Ohanian SIM Card.

66.     Due to the sensitive nature of the various media content that Ohanian had received on his iPhone, Ohanian attempted to address the issue with Apple.

67.     During the Class Period, Ohanian wrote both to an Apple Store employee and to Apple CEO Tim Cook with a request to investigate what had occurred.

68.     Thereafter, and during the Class Period, Ohanian sent the same request to the Apple Privacy team.

69.     An Apple Privacy employee subsequently advised Ohanian that he should merely delete the phone number and SIM card that he was not using, despite the fact that the SIM card was already blocked, and the fact that the proposed solution would do nothing to resolve the wide-scale problem of unintended and improper disclosures of iPhone users' iMessage correspondence and FaceTime calls to third parties through the security flaw in the iOS software utilized in the iPhone.

70.     Named Plaintiffs subsequently determined that the private communications that Ohanian improperly received on his iPhone during the time period in question had been directed and meant for Lopez.

71.     In sum, after the Ohanian SIM Card was blocked, Lopez had purchased a SIM card from T-Mobile that had been assigned the Affected Number, which T-Mobile had recycled from the number on the Ohanian SIM Card.

72.     Once Lopez activated the SIM card in his new iPhone, Apple services became associated with the Affected Number, but Ohanian's old phone number from the Ohanian SIM Card was still linked to Ohanian's Apple ID.   As such, all iMessage correspondence and FaceTime calls intended for, and directed to, the new user of the Affected Number – Lopez – were instead received by Ohanian on his iPhone.

73.     Apple never notified Named Plaintiffs – or any other members of the putative class – that they needed to manually disassociate old phone numbers utilized on iPhones from their Apple accounts to prevent those iPhone accounts from receiving unwanted (and potentially harmful) iMessage correspondence and FaceTime calls when those phone numbers are recycled by wireless network carriers, such as T-Mobile.

74.     Further, Named Plaintiffs were severely damaged by Defendants' conduct.

75.     Specifically, Ohanian suffered, *inter alia*, significant and irreparable emotional and marital distress because he was unable to explain to his wife why he was receiving the content on his iPhone – including pictures of young children – which clearly appeared to be coming from a woman (who was not Ohanian's wife).

76.     Similarly, Lopez suffered, *inter alia*, significant and irreparable damages, including emotional distress, because he did not receive, *inter alia*, the pictures of his child,

which he can no longer obtain because the relationship between him and the child's mother has terminated.  Lopez can never get those pictures or memories back.

**H.**     **Apple's Knowledge and Deliberate Concealment of Security Breaches**

77.     Contrary to Apple's repeated assurances to the public about the variety of extensive measures it had implemented to protect the privacy rights of consumers that purchased Apple iPhones and utilized iMessage and FaceTime – by way of various advertisements and marketing campaigns touting such features of its iPhones as discussed *supra* – Apple had been aware of the problem in its iOS software allowing iPhone users' communications to be improperly disclosed to third parties dating back to at least 2012.

78.     In order to remedy the problem of iPhone users' communications being improperly disclosed to third parties, Apple never rewrote its code, nor did Apple advise consumers to manually disassociate their Apple IDs from the recycled SIM Cards.

79.     Instead, with the release of iOS 12 on or about September 17, 2018, Apple finally introduced mandatory multifactor authentication, which is a method by which an iPhone user can only be granted access to an iPhone by successfully presenting two or more factors in order to confirm his or her identity.  Such factors may include a piece of information only the user would know or a password.

80.     Despite the foregoing, Apple never informed consumers and iPhone users – including Named Plaintiffs and members of the putative class – about the fact that, based on a security flaw in the iOS software known to Apple, there had been innumerable unintended disclosures of iPhone users' iMessage correspondence and FaceTime calls to third parties for nearly seven years prior to that.

81.     Instead, at or near the time that iOS 12 was released and Apple introduced mandatory two-factor authentication, Apple merely updated its website to state that two-factor authentication no longer could be turned off on the iPhone.

82.     Moreover, on information and belief, even to this day, not all consumers that purchased iPhones or T-Mobile SIM cards for use in iPhones have installed iOS 12 on their iPhones, and the data security breaches alleged herein still may be affecting those consumers.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Violations of NY GBL § 349 Against Apple)

83.     Named Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully set forth herein.

84.     Named Plaintiffs bring this claim individually and on behalf of members of the class based on Apple's violations of NY GBL § 349.

85.     NY GBL § 349 was enacted to protect consumers in New York from those that engage in deceptive or unfair acts or practices in the conduct of any business.

86.     Apple's business acts and practices alleged herein, including the representations it made regarding the data privacy and security features of the iPhone, were specifically directed at consumers in New York and constitute "consumer-oriented conduct" in New York as described in NY GBL § 349.

87.     As detailed throughout the Complaint, at all times relevant herein, Apple, in conducting its business – which included the advertising, marketing, distributing, and selling of its consumer product, the iPhone – possessed material information regarding a known security flaw in the iPhone's iOS software that allowed iMessage correspondence sent by iPhone users and FaceTime calls made by iPhone users to be improperly accessed by third parties.

88.     At all times relevant herein, Apple failed to inform consumers of the existence of the aforementioned security flaw in the iPhone's iOS software, including Named Plaintiffs and those members of the class that purchased the iPhone during the Class Period.

89.     Apple's failure to disclose this information to consumers was a material omission under NY GBL § 349, because the non-disclosure of the significant security flaw in the iPhone's iOS software was likely to mislead a reasonable consumer as to the data privacy and security features of the iPhone, including the privacy and security of iMessage correspondence and FaceTime calls.  To wit, reasonable consumers, including Named Plaintiff and members of the class who purchased iPhones during the Class Period, reasonably would have expected that their communications via iPhone and through the iMessage and FaceTime features of the iPhone were private and secure, and were not being improperly accessed by third parties.

90.     Apple's deceptive acts and practices as alleged herein injured Named Plaintiffs and members of the class in that they: (i) paid premium prices to purchase iPhones that did not have the data privacy and security features that Apple represented; and/or (ii) were deprived of the benefit of the bargain because the iPhones that they purchased had considerably less value than what Apple represented due to the security flaw in the iOS software that put their personal confidential information at risk and impacted their privacy rights; and/or (iii) became victims of privacy violations; and/or (iv) suffered significant and irreparable emotional distress, strained familial relationships, anxiety, humiliation, and annoyance.

91.     Apple's actions impacted the public interest and affected the New York public at large, because Named Plaintiff and members of the class were injured in exactly the same way as millions of others who purchased iPhones based on Apple's generalized course of deceptive business acts and practices.

92.     Apple's conduct in employing deceptive business acts and practices directed at consumers as alleged herein was malicious, willful, wanton, and outrageous so as to shock the conscience of the community and to warrant the imposition of punitive damages.

93.     Based on Apple's violations of NY GBL § 349 as alleged herein, Named Plaintiffs and each member of the class are entitled to recover statutory damages in the sum of $50 each, plus punitive damages, attorneys' fees and costs, and any other relief the Court deems appropriate.

94.     Given that the size of the putative class is believed to exceed 1 million consumers, statutory damages based on Apple's violations of NY GBL § 349 as alleged herein exceed the sum of $50 million.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Violations of NY GBL § 350 Against Apple)

95.     Named Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully set forth herein.

96.     Named Plaintiffs bring this claim individually and on behalf of the other members of the class based on Apple's violations of NY GBL § 350.

97.     Apple has been and is engaged in the "conduct of … business, trade or commerce" within the meaning of NY GBL § 350.

98.     NY GBL § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce."   NY GBL § 350-a(1) provides that "false advertising" is advertising that is "misleading in a material respect," and includes not only representations, "but also the extent to which the advertising fails to reveal facts material in light of such representations."

99.     At all times relevant herein, Apple possessed material information regarding a known security flaw in the iPhone's iOS software that allowed iMessage correspondence sent by iPhone users and FaceTime calls made by iPhone users to be improperly accessed by third parties.

100.     At all times relevant herein, Apple failed to inform consumers of the aforementioned security flaw in the iPhone's iOS software that put consumers' personal confidential information at risk and impacted their privacy rights.

101.     Instead, Apple caused to be disseminated – through advertising, marketing, and other publications both in print and in digital media, including its website – statements that were untrue and/or misleading regarding the data privacy and security of the iPhone, including the iMessage and FaceTime features, that touted the iPhone as having, *inter alia*, iOS software which it claimed was the most advanced security of any mobile operating system.

102.     Apple's failure to disclose the known security flaw in the iPhone's iOS software to consumers was a material omission, because it was likely to mislead a reasonable consumer as to the data privacy and security features of the iPhone, including the privacy and security of iMessage correspondence and FaceTime calls.

103.     Named Plaintiffs and other class members purchased iPhones during the Class Period in reliance upon Apple's false advertising regarding the data privacy and security features of iPhones, and would not have purchased iPhones had Apple not made material omissions regarding the significant security flaw in the iPhone's iOS software that put their personal confidential information at risk and impacted their privacy rights.

104.     Apple's false advertising regarding the data privacy and security features of the iPhone, including its material omissions as alleged herein, injured Named Plaintiffs and members

of the class in that they: (i) paid premium prices to purchase iPhones that did not have the data privacy and security features that Apple represented; and/or (ii) were deprived of the benefit of the bargain because the iPhones that they purchased had considerably less value than what Apple represented due to the security flaw in the iOS software that put their personal confidential information at risk and impacted their privacy rights; and/or (iii) became victims of privacy violations; and/or (iv) suffered significant and irreparable emotional distress, anxiety, humiliation, and annoyance.

105.   Apple's conduct in utilizing false advertising that conveyed material misrepresentations to consumers regarding the data privacy and security features of the iPhone, while at the same time making material omissions as to the known security flaw in the iPhone's iOS software as alleged herein, was malicious, willful, wanton, and outrageous so as to shock the conscience of the community and to warrant the imposition of punitive damages.

106.   Based on Apple's violations of NY GBL § 350 as alleged herein, Named Plaintiffs and each member of the class are entitled to recover statutory damages in the sum of $500 each, plus punitive damages, attorneys' fees and costs, and any other relief the Court deems appropriate.

107.   Given that the size of the putative class is believed to exceed 1 million consumers, statutory damages based on Apple's violations of NY GBL § 350 as alleged herein exceed the sum of $500 million.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Fraudulent Misrepresentation Against Apple)

108.   Named Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully set forth herein.

109. Named Plaintiffs bring this claim individually and on behalf of the other members of the class based on Apple's fraudulent misrepresentations and material omissions regarding the data privacy and security of the iPhone and its unique iMessage and FaceTime features.

110. At all times relevant herein, Apple, in conducting its business – which included the advertising, marketing, distributing, and selling of its consumer product, the iPhone – possessed material information regarding a known security flaw in the iPhone's iOS software that allowed iMessage correspondence sent by iPhone users and FaceTime calls made by iPhone users to be improperly accessed by third parties.

111. At all times relevant herein, Apple failed to inform consumers, including Named Plaintiffs and members of the class, of the aforementioned security flaw in the iPhone's iOS software that put their personal confidential information at risk and impacted their privacy rights. In fact, at all times relevant herein, rather than disclosing the existence of the known security flaw to consumers, Apple touted the iPhone as having, *inter alia*, iOS software which it claimed was the most advanced security of any mobile operating system.

112. After FaceTime and iMessage first were introduced on the iPhone, Apple was well aware of the security flaw that existed in the iOS software. However, Apple failed to disclose the known security flaw in the iPhone's iOS software to Named Plaintiffs and members of the class for purposes of inducing them to purchase iPhones, because Named Plaintiffs and members of the class would not have purchased iPhones had they known about the significant security flaw in the iPhone's iOS software that put their personal confidential information at risk and impacted their privacy rights.

113. Named Plaintiffs and members of the class justifiably relied on Apple's material omissions regarding the data privacy and security features of iPhones, and purchased iPhones

during the Class Period under the reasonable but mistaken belief that their personal confidential information and privacy rights would be protected when using the iPhone.

114.    Apple's fraudulent misrepresentations and material omissions regarding the data privacy and security features of the iPhone caused Named Plaintiffs and other class members to suffer damages including, *inter alia*, monies that they paid to purchase iPhones that had considerably less value than what Apple represented, due to the security flaw in the iOS software that put their personal confidential information at risk and impacted their privacy rights.  In other words, Named Plaintiffs and members of the class did not receive the benefit of the bargain.

115.    Apple's conduct as alleged herein was malicious, willful, wanton, and outrageous so as to shock the conscience of the community and to warrant the imposition of punitive damages.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Unjust Enrichment Against Apple)

116.    Named Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully set forth herein.

117.    In the alternative to their claims for violations of GBL §§ 349 and 350 and their claim for fraudulent misrepresentation, Named Plaintiffs, on behalf of themselves and members of the class, bring a common law claim for unjust enrichment against Apple.

118.    As alleged herein, Apple violated state law by advertising, marketing, distributing, and selling iPhones to consumers, including Named Plaintiffs and members of the class, while misrepresenting and omitting material facts regarding the data privacy and security of the iPhones.

119.    Named Plaintiffs and members of the class conferred significant financial benefits and paid substantial sums of money to Apple to purchase iPhones during the Class Period, which

were not as Apple represented them to be, namely with respect to the iPhones' data privacy and security features.

120.    Apple's unlawful conduct as described in the Complaint enriched Apple and allowed Apple to realize substantial revenues from selling its iPhones at the expense of, and to the detriment of, Named Plaintiffs and members of the class.

121.    Under New York's common law principles of unjust enrichment, it is against equity and good conscience to permit Apple to retain the benefits and substantial revenues conferred upon it from selling its iPhones to Named Plaintiffs and members of the class, given that the iPhones were not as Apple represented them to be.

122.    Accordingly, Named Plaintiffs and members of the class seek disgorgement of all such profits from Apple, from which Named Plaintiffs and members of the class may seek restitution.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**(Violations of NY GBL § 349 Against T-Mobile)**

123.    Named Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully set forth herein.

124.    Named Plaintiffs bring this claim individually and on behalf of members of the class based on T-Mobile's violations of NY GBL § 349.

125.    NY GBL § 349 was enacted to protect consumers in New York from those that engage in deceptive or unfair acts or practices in the conduct of any business.

126.    T-Mobile's business acts and practices alleged herein, namely, its sale of SIM cards for use in the iPhone, were specifically directed at consumers in New York and constitute "consumer-oriented conduct" in New York as described in NY GBL § 349.

127.    At all times relevant, T-Mobile possessed material information that its practice of recycling phone numbers linked to SIM cards, and selling those SIM cards to consumers for use in the iPhone without requiring prior users to manually disassociate their Apple IDs from the phone numbers associated with the recycled SIM cards, did not protect the privacy of consumers' data and confidential personal information while using the iPhone.

128.    At all times relevant, T-Mobile failed to inform consumers of the fact that its practice of recycling phone numbers linked to SIM cards, and selling those SIM cards to consumers for use in the iPhone without requiring prior users to manually disassociate their Apple IDs from the phone numbers associated with the recycled SIM cards, did not protect the privacy of consumers' data and confidential information while using the iPhone.

129.    T-Mobile's failure to disclose this information to consumers was a material omission, because it was likely to mislead a reasonable consumer who would reasonably believe that he or she was purchasing a SIM card that would provide a private and secure means to communicate through the iPhone.  To wit, reasonable consumers, including Named Plaintiff and members of the class who purchased SIM Cards from T-Mobile for use in iPhones during the Class Period, reasonably would have expected that those SIM cards would allow them to privately and securely communicate through the iPhone, and that their communications would not be improperly accessed by third parties.

130.    T-Mobile's deceptive acts and practices as alleged herein injured Named Plaintiffs and members of the class in that they: (i) paid premium prices to purchase T-Mobile SIM cards that did not provide them with a private and secure means to communicate through the iPhone on the T-Mobile wireless network; and/or (ii) were deprived of the benefit of the bargain because the T-Mobile SIM cards that they purchased had considerably less value than

what T-Mobile represented due to the fact that the T-Mobile SIM cards did not provide them with a private and secure means to communicate through the iPhone on the T-Mobile wireless network; and/or (iii) became victims of privacy violations; and/or (iv) suffered significant and irreparable emotional distress, anxiety, humiliation, and annoyance.

131.    T-Mobile's actions impacted the public interest and affected the New York public at large, because Named Plaintiffs and members of the class were injured in exactly the same way as millions of others who purchased T-Mobile SIM cards to use in iPhones based on a reasonable expectation that their data and confidential personal information would be protected.

132.    T-Mobile's conduct in employing deceptive business acts and practices directed at consumers as alleged herein was malicious, willful, wanton, and outrageous so as to shock the conscience of the community and to warrant the imposition of punitive damages.

133.    Based on T-Mobile's violations of NY GBL § 349 as alleged herein, Named Plaintiffs and each member of the class are entitled to recover statutory damages in the sum of $50 each, plus punitive damages, attorneys' fees and costs, and any other relief the Court deems appropriate.

134.    Given that the size of the putative class is believed to exceed 1 million consumers, statutory damages based on T-Mobile's violations of NY GBL § 349 as alleged herein exceed the sum of $50 million.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Violations of NY GBL § 350 Against T-Mobile)

135.    Named Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully set forth herein.

136.    Named Plaintiffs bring this claim individually and on behalf of the other members of the class based on T-Mobile's violations of NY GBL § 350.

137.    T-Mobile has been and is engaged in the "conduct of … business, trade or commerce" within the meaning of NY GBL § 350.

138.    NY GBL § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce."   NY GBL § 350-a(1) provides that "false advertising" is advertising that is "misleading in a material respect," and includes not only representations, "but also the extent to which the advertising fails to reveal facts material in light of such representations."

139.    At all times relevant, T-Mobile marketed and sold SIM cards to consumers for use in the iPhone.

140.    At all times relevant, T-Mobile possessed material information that its practice of recycling phone numbers linked to SIM cards, and selling those SIM cards to consumers for use in the iPhone without requiring prior users to manually disassociate their Apple IDs from the phone numbers associated with the recycled SIM cards, did not protect the privacy of consumers' data and confidential personal information while using the iPhone.

141.    At all times relevant, T-Mobile failed to inform consumers of the fact that its practice of recycling phone numbers linked to SIM cards, and selling those SIM cards to consumers for use in the iPhone without requiring prior users to manually disassociate their Apple IDs from the phone numbers associated with the recycled SIM cards, did not protect the privacy of consumers' data and confidential personal information while using the iPhone.

142.    T-Mobile's failure to disclose this information to consumers was a material omission, because it was likely to mislead a reasonable consumer who would reasonably believe that he or she was purchasing a SIM card that would provide a private and secure means to communicate through the iPhone.

143.    Named Plaintiffs and other class members purchased T-Mobile SIM cards during the Class Period in reliance upon T-Mobile's false advertising that its SIM cards would provide them with a private and secure means to communicate through the iPhone, and would not have purchased T-Mobile SIM cards had they known that the SIM cards did not protect the privacy of their data and confidential personal information while using the iPhone.

144.    T-Mobile's false advertising and material omissions as alleged herein injured Named Plaintiffs and members of the class in that they: (i) paid premium prices to purchase T-Mobile SIM cards that did not provide them with a private and secure means to communicate through the iPhone on the T-Mobile wireless network; and/or (ii) were deprived of the benefit of the bargain because the T-Mobile SIM cards that they purchased had considerably less value than what T-Mobile represented due to the fact that the T-Mobile SIM cards did not provide them with a private and secure means to communicate through the iPhone on the T-Mobile wireless network; and/or (iii) became victims of privacy violations; and/or (iv) suffered significant and irreparable emotional distress, anxiety, humiliation, and annoyance.

145.    T-Mobile's conduct as alleged herein was malicious, willful, wanton, and outrageous so as to shock the conscience of the community and to warrant the imposition of punitive damages.

146.    Based on T-Mobile's violations of NY GBL § 350 as alleged herein, Named Plaintiffs and each member of the class are entitled to recover statutory damages in the sum of $500 each, plus punitive damages, attorneys' fees and costs, and any other relief the Court deems appropriate.

147.    Given that the size of the putative class is believed to exceed 1 million consumers, statutory damages based on T-Mobile's violations of NY GBL § 350 as alleged herein exceed the sum of $500 million.

### AS AND FOR A SEVENTH CAUSE OF ACTION
#### (Fraudulent Misrepresentation Against T-Mobile)

148.    Named Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully set forth herein.

149.    Named Plaintiffs bring this claim individually and on behalf of the other members of the class based on T-Mobile's fraudulent and material omissions related to its SIM card practices.

150.    At all times relevant, T-Mobile marketed and sold SIM cards to consumers for use in the iPhone.

151.    At all times relevant, T-Mobile possessed material information that its practice of recycling phone numbers linked to SIM cards and selling those SIM cards to consumers for use in the iPhone without requiring prior users to manually disassociate their Apple IDs from the phone numbers associated with the recycled SIM cards, did not protect the privacy of consumers' data and confidential personal information while using the iPhone.

152.    At all times relevant, T-Mobile failed to inform consumers, including Named Plaintiffs and members of the class, of the fact that its practice of recycling phone numbers linked to SIM cards and selling those SIM cards to consumers for use in the iPhone without requiring prior users to manually disassociate their Apple IDs from the phone numbers associated with the recycled SIM cards, did not protect the privacy of their data and confidential personal information while using the iPhone.

153.   T-Mobile failed to disclose its SIM card practices to Named Plaintiffs and members of the class for purposes of inducing them to purchase T-Mobile SIM cards, because Named Plaintiffs and members of the class would not have purchased T-Mobile SIM cards had they known that the SIM cards would not provide them with a private and secure means to communicate through the iPhone.

154.   Named Plaintiffs and members of the class justifiably relied on T-Mobile's material omissions regarding its SIM card practices as alleged *supra*, and purchased T-Mobile SIM cards during the Class Period under the reasonable but mistaken belief that the SIM cards would provide them with a private and secure means to communicate through the iPhone on T-Mobile's wireless network.

155.   T-Mobile's fraudulent and material omissions as alleged herein caused Named Plaintiffs and other class members to suffer damages including, *inter alia*, monies that they paid to purchase SIM cards that had considerably less value than what T-Mobile represented, due to the fact that the SIM cards did not provide them with a private and secure means to communicate through the iPhone on the T-Mobile wireless network.  In other words, Named Plaintiffs and members of the class did not receive the benefit of the bargain.

156.   T-Mobile's conduct as alleged herein was malicious, willful, wanton, and outrageous so as to shock the conscience of the community and to warrant the imposition of punitive damages.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### (Unjust Enrichment Against T-Mobile)

157.   Named Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully set forth herein.

158.    In the alternative to their claims for violations of GBL §§ 349 and 350 and their claim for fraudulent misrepresentation, Named Plaintiffs, on behalf of themselves and members of the class, bring a common law claim for unjust enrichment against T-Mobile.

159.    As alleged herein, T-Mobile violated state law by advertising, marketing, distributing, and selling iPhone-compatible SIM cards for use in the iPhone to consumers, including Named Plaintiffs and members of the class, while failing to inform consumers of the fact that its practice of recycling phone numbers linked to SIM cards, and selling those SIM cards to consumers for use in the iPhone without requiring prior users to manually disassociate their Apple IDs from the phone numbers associated with the recycled SIM cards, did not protect the privacy of consumers' data and confidential information while using the iPhone.

160.    Named Plaintiffs and members of the class conferred significant financial benefits and paid substantial sums of money to T-Mobile to purchase SIM cards during the Class Period which were not as T-Mobile represented them to be, because Named Plaintiffs and members of the class reasonably would have expected that those SIM cards would allow them to privately and securely communicate through the iPhone, and that their communications would not be improperly accessed by third parties.

161.    T-Mobile's unlawful conduct as described in the Complaint enriched T-Mobile and allowed T-Mobile to realize substantial revenues from selling its SIM cards at the expense of, and to the detriment of, Named Plaintiffs and members of the class.

162.    Under New York's common law principles of unjust enrichment, it is against equity and good conscience to permit T-Mobile to retain the benefits and substantial revenues conferred upon it from selling its SIM cards to Named Plaintiffs and members of the class, given that the SIM cards were not as T-Mobile represented them to be.

163.    Accordingly, Named Plaintiffs and members of the class seek disgorgement of all such profits from T-Mobile, from which Named Plaintiffs and members of the class may seek restitution.

## JURY DEMAND

Named Plaintiffs demand a trial by jury on all claims in this action.

**WHEREFORE**, Named Plaintiffs, on behalf of themselves and all other similarly situated, respectfully demand relief as follows:

a.  Declaring this action to be a proper class action and certifying Named Plaintiffs as the representatives of the class under Rule 23 of the Federal Rules of Civil Procedure;

b.  On the First Cause of Action, an award of statutory damages, punitive damages, and attorneys' fees and costs;

c.  On the Second Cause of Action, an award of statutory damages, punitive damages, and attorneys' fees and costs;

d.  On the Third Cause of Action, an award of damages, punitive damages, and attorneys' fees and costs;

e.  On the Fourth Cause of Action, disgorgement of profits and establishment of a fund through which Named Plaintiffs and members of the class may seek restitution;

f.  On the Fifth Cause of Action, an award of statutory damages, punitive damages, and attorneys' fees and costs;

g.  On the Sixth Cause of Action, an award of statutory damages, punitive damages, and attorneys' fees and costs;

h.  On the Seventh Cause of Action, an award of damages, punitive damages, and attorneys' fees and costs;

i.  On the Eighth Cause of Action, disgorgement of profits and establishment of a fund through which Named Plaintiffs and members of the class may seek restitution;

j.  An award of Named Plaintiffs' reasonable attorneys' fees, costs, and expenses incurred in connection with this action and any other post-Judgment collection efforts, to the extent not already awarded; and

k.  Such other, further, and different relief as the Court deems just and proper.

Dated: New York, New York
       July 6, 2020

/s Aaron J. Solomon_____
Aaron J. Solomon, Esq.
OVED & OVED LLP
*Attorneys for Plaintiffs*
401 Greenwich Street
New York, NY 10013
Tel: 212.226.2376